This is 22-491 Restaurant Law Center v. City of New York Good morning, your honors. Alina Jerker on behalf of the city. I think as your honors noted, the law here is not preempted by the NLRA. It also does not violate the Dormant Commerce Clause. The city council responded to a well-documented problem, an immediate problem requiring local legislation, which was really rampant unfair labor practices in the fast food industry. So let's take the hypothetical that your friend on the other side posed. Could the city legislate the substantive effect or the substance of a full collective bargaining agreement without running afoul of that turning into in some way an interference with the bargaining process? I think that depends on how you define the substance of a collective bargaining agreement, to which I mean if what you're saying is you take the cover off, as my friend suggested, and you just label it local law, there are provisions for union reps. There are provisions for progressive discipline. Our law is skeletal here. It just says that the employer shall create a plan for progressive discipline. But a collective bargaining agreement has a multi-step grievance procedure. You do draw a distinction between substantive law and procedural aspects of a collective bargaining agreement. And the Supreme Court has never said that a substantive labor provision that applies to union and non-unionized employees equally would violate it. So does that mean if you take the cover off and then remove the procedural elements- You remove 80% of it, which is all of the protections that union employees- Taking out the question of whether there's some ongoing labor dispute that might run afoul in another way. So just based on a pro-labor view and all of the same interests that you were beginning with, imposes legislatively the substantive provisions that it plucks from a collective bargaining agreement. I mean I would say that if you asked someone from 1935 to look at labor law as it exists today, they would say that's practically what happened. As in, not only have minimum wages gone up, but we have paid sick leave. So paid sick leave was a provision in many collective bargaining agreements. And then it is now a pretty well-adopted law across the country. Would we say that the fact that it was in some collective bargaining agreement 30 years before it, or 20 years, whatever it was, before it became a law, somehow precludes us from legislating that when it becomes a sort of standard? So I guess I think it's a hard question. But no, I think if you take just the substantive lines, just the workplace protections that are- Council, just what we were discussing earlier with opposing council. Where do you draw the line? When does all these local minimum standards become so much like a CBA that you can't tell the difference? I don't think you need to draw a line. If they are substantive labor protections that apply to union and non-union employees alike, they are labor laws that are minimum, as in they set a floor, they apply to everyone. And they set the background principles in front of which we do collective bargaining. Your answer is the line is a substance versus process line, which is certainly consistent with the language in all of the relevant Supreme Court cases. Effectively, yes. And I think that the two cases that my friends rely on, which are Bagdon and Shannon, are just- the court need not split from them. They are just really clearly distinguishable on their facts and on their circumstances. Shannon, I think, is the cleanest example. In Shannon, there was an ongoing labor dispute. So there's a difference between- and the law in Shannon, let me say, it was not a labor law applied across the board to union and non-union employees. Within that local jurisdiction, there were 102 counties or something. And this was a law that applied to just Cook County. Literally, really, it was like a bill of attainer designed to respond to one very specific labor dispute. That's not what we have here. A specific and ongoing labor dispute. A specific and ongoing labor dispute. So that is- And not a question about unionization, but where collective bargaining was happening, and there was a dispute about- There was an expired agreement, and they refused to bend on this, so we'll just legislate it. We can't do that. We'll concede that, of course, because that is exactly what the NLRA is designed for. It's an exercise in cooperative federalism, right? So the states are not preempt- local governments aren't preempted from legislating, but we aren't permitted to interfere with the process of unionization, which means either- Okay, so Shannon is the easier one. Shannon is the easier one. Bracken is, I think, confined to its own terms by the Ninth Circuit itself, because the decision really turns on a- The targeted nature of the labor practice there, it was targeting a very specific industry, and the Ninth Circuit has itself repudiated that, and Concerned Care does a similar thing, and upholds a law similar. Car Wash upholds a law. Roundout. Those Second Circuit cases have basically said that that part of Bracken, and the Ninth Circuit in Ninh also said, that part of Bracken is just not good law anymore. And so one of the sort of central pillars upon which Bracken is sitting is no longer law, and I would query whether the case would come out the same now, but it also has another aspect to it, which is it tied wages to a prevailing rate based on a variable rate that was based on collective bargaining. So not only did it put pressure- The law itself was sort of problematic, because it put pressure on- it put additional weight on that bargained-for rate by- On an ongoing basis, and it would change- So it's impacting the process of that ongoing basis by bringing more people- Into the- Interests on both sides into that bargaining process ongoing. Exactly. So it's affecting a bargaining process. Exactly. And on the other hand, in Concerned Care, we actually did have a prevailing wage law that had looked to- Static. Union rates, but it was static. Exactly. And so it didn't place the kind of pressure on the unionization process and on the bargaining process. It had already happened. Exactly. And that's the difference, and that's why those two cases really just aren't determinative here, or really even all that helpful here. Because here the real question is just, does this impair collective bargaining? It does not. Does it interfere with the economic weapons of self-help? Why would these workers be interested in collective bargaining when they get so much under the wrongful discharge law? It's a great rhetorical question. First of all, I'll say, as I understand it, they're still trying to unionize, so it clearly hasn't answered the question for them. I think it's a disincentive question. I don't think it is a disincentive, and I think that's because I think there's a misconstruction going on of the law itself here. It's a skeletal law. What it does is it requires just cause for termination, but it requires the employee to know or should have known that the fast food employer's policy, rule, or practice is the basis for progressive discipline. The employer sets that. This isn't like the workers collectively come to the same table and they discuss what will be the terms of employment, what will count as a mild, what will count as a severe form of discipline, what kind of misconduct can I get away with. None of that. The employer writes all of that. This is not the kind of thing that's so grand that it supplants collective bargaining. Certainly for the immediate purpose, this record does not establish by a preponderance that this law either incentivizes or disincentivizes unionization, and I think Carwash tells us that they would have to establish factually that it incentivizes or disincentivizes unionization. Certainly at a logical level, if you look at it, I think you don't know. I agree with you on the law that on this facial challenge, I don't think they could make that point out. I actually think that even just reading the law makes it pretty clear as a matter of common sense that this doesn't put a thumb on the scale in favor of unionization because it is in the same or any more so than any other workplace protection. Paid sick leave is a good example. Would you say that paid sick leave has taken something valuable that used to be subject to bargaining and taken it off the table? I mean, sure, but that doesn't mean that it's put a thumb on the scale in terms of unionization or not or disincentivized unions to an impermissible degree, let's say, because any minimum labor standard, right? I mean, the more we lift workers as a society, of course, the less severe the abuses might be on the other side, but the fact that we don't permit employers to fire people for discriminatory purposes might disincentivize unionization, but it wouldn't violate the NLRA. And if, Your Honors, I know I had... Why doesn't this 30 establishment rule violate the Dormant Commerce Clause? It just doesn't. It doesn't because... Let me elaborate on that. Yes, the Dormant Commerce Clause, to the extent that you can find a Dormant Commerce Clause after pork producers, that really bears in any way on this case. It doesn't do anything because the heart of the Dormant Commerce Clause, as the Supreme Court has said time and again, is about economic protectionism. So if we have an in-state competitor and we want to protect our in-state competitors from out-of-state competition by enacting a law, that would be a problem under the Dormant Commerce Clause, perhaps. But a law that applies across the board to all entities of a certain size is not a law that is protectionist of in-state interests. It's a law that's protectionist of labor employees' interests here. And protection also of smaller businesses. No, I don't even think it... It doesn't apply to smaller businesses. And I think my friend said that the law was meant because it somehow acknowledges that it cripples smaller businesses. It doesn't do that. The law has taken a definition about 30 or more businesses from the state. There's already a pre-existing statutory scheme that treats 30 or more and 29 and less differently. And for an administrative burden, just a regulatory burden, it makes sense for us to continue using those same rules. Otherwise, a person operating a 29 or more establishment has to think, do I fall into this law, do I follow that law? It's an even box. You have 30 or more locations. Right, but it imposes regulatory burdens unquestionably on those that fall within it. Absolutely, but not based on the fact that they operate out of state. Right, if you operate not facially, and then the argument being made is that it affects, again, not in-state versus out-of-state but fully interstate, entities that operate interstate and none that operate fully intrastate. So therefore they say we're under discriminatory effects to the extent it survives and get strict scrutiny. So what's your answer to the effects argument? It's not a function of economic discrimination. And so I don't even think it gets to that level. Right, if you have 29 locations and 28 of them are out of state and one of them is inside the city, the law doesn't apply to you. If you have 30 locations and one of them is in the city, it applies to you. If you have 29 locations in New York City and you open one in Long Island, you're 30th, it applies to you. The point is that this law isn't in any way looking at the identity of the, you know, creating a benefit for in-state comparators. In fact, it's creating a burden on businesses in-state the way that all regulations that, you know, that are costly in some ways might. But it's not doing it for discriminatory purposes or with a discriminatory effect. It's doing it. Do we know if of the entities that fall within the regulation, if more or less are headquartered in-state or out-of-state? I don't know. There are, I know, something like over 2,000 French large chain fast food businesses that operate in New York. What I do know is that from my quick Google, and I'm not a connoisseur of fast food, I was able to find more than a handful that operate and are headquartered in New York City, like Shayshack and Nathan's Famous and Golden Crust. So the idea that, I mean, that's outside of the record, but I think the point really is that no one in the record has taken up the task of proving that this is somehow made to benefit local businesses in order to exclude large chains. It's meant to create a regulatory regime that places which have an economy of scale can act together and use those economies to provide additional protections for workers, which include things like giving them notice when they're going to be terminated based on some sort of workplace violation of the employer's guidelines, with documentation, with keeping a record of it. I mean, recordkeeping requirements are just facilitating all of these laws and also facilitating larger laws, like the larger sort of robust set of worker protections that exist. Because when people are subject to arbitrary termination, they are hesitant to complain about wage theft and about abuses and about retaliation and about discrimination and all the other laws that are all minimum labor standards. And that should be upheld. Unless my colleagues have another on government compromise costs. I did have one more on preemption. I think opposing counsel started to move to this, but we didn't get to it. So I did want to ask. They make an argument about weapons of self-help and, in particular, lockouts. And I think the argument goes the discharge provision definition would include reduced hours and, therefore, that would apply in a collective bargaining context. Not in most instances here, but in a collective bargaining context, would prevent an employer from using lockouts as part of a negotiation tactic. Setting aside for a moment the facial versus as applied question, do you agree? I suppose that's the state law interpretation question, which the district court found not applicable to lockouts. I'm not sure that's clear on the face of this law, that it wouldn't apply in that instance. Do you agree, if it does, that that would be at least as applied a preemption issue? Would it be preempted in application? If I understand correctly, the scenario would be that there is an active labor dispute, there is an actual collective bargaining agreement in place, which doesn't Actual collective bargaining agreement in place and an employer uses lockouts as part of its weapon of self-help. I'm enamored with the term. I believe it would be preempted in that situation. It would be preempted. But I also think that there's, I mean, it's just such a stretch to think that the law would ever be applied there. I don't think that any, you know, the law is administered by a city agency that's bound by federal law, just like all of us. And if the law can be, any law really, not any law, but many laws could be weaponized in a way that might violate the NLRA, but wouldn't be because it's just a very strained reading to think that that would, I mean, I suppose, yes, you could create, you could assign that to a reduction of hours. I just think it's a- Your argument is, I think your answer, tell me if I've got it. If it were applied in that context, it would be a preemption problem. But you can't imagine that it would be applied in that context, either because of the face of the city law itself, or because such a reading of the city law would present the city with an NLRA problem. That's right. And also that this is just a scenario that's so far afield from, like, possible reality. The lack of unionization in the industry coupled with the fact that I think there have been four lockouts across the entire country in the last two years or so. So in any event, it's certainly not the case that it applies in every respect. A facial challenge, yeah, absolutely. Thank you, Your Honor. Thank you. All right, Mr. Peterson, you have two minutes. Thank you, Your Honor. Shannon can be distinguished factually, but neither the Seventh Circuit's reasoning nor this Court's discussion of it in concerned home care providers rested on the ongoing labor dispute. This is from concerned home care providers. For Shannon, the law at issue in that decision established terms of employment that would be very difficult for any union to bargain for. Such provisions represent a substantially more targeted invasion, and I'm paraphrasing. Right, it's the targetedness, the targetedness of it. Well, it was targeted because they were hard for any union to bargain for. Detailed break requirements, changes to burden of proof, damage calculations and retaliation. The analysis of this Court in concerned home care providers and the Seventh Circuit and Shannon itself was about the nature of the law, not the bargaining dispute. It was about targeting an ongoing dispute and, therefore, the nature of the law impacting legislative, by legislative fiat, the outcome of that ongoing dispute. Let me give you the full quote, Your Honor. The law at issue in that decision, quote, established terms of employment. Yeah, I've read it. Okay. I think it's very hard to read targeted in that second sentence there as referring to anything other than the aspects. Well, how about the textual sentence that the footnote drops from, which tells us a lot about its meaning? It uses targeted there as well. And I think, since the reasoning of Shannon was about the impact on the ongoing dispute. I certainly don't think so. So I read Shannon as warning about precisely what happened here, which is that it is encouraging employers and unions to focus on lobbying here before the legislature instead of negotiating at the bargaining table. That change in the burden of proof is very significant. Wait, I'm sorry, say that again. I didn't quite follow you. But it encourages employers and unions to focus on lobbying here before the legislature, Shannon said, at the state capitol instead of negotiating at the bargaining table. And that's the question. In ongoing labor disputes. What's wrong with that? Constitutional right to lobby. Democracy. It's a democracy. The NLO right. It seems a little anomalous for your great organization, the Chamber of Commerce, to throw stones at lobbying legislatures. The National Restaurant Association. I'm sorry, the Restaurant Law Center and the New York Restaurant Association are not the Chamber of Commerce. But to be clear, what I'm arguing for is to preserve. They both lobby, though, don't they? At times. But again, what we're doing is trying to preserve the collective bargaining process that Congress allowed. And that requires leaving room for employers and employees to lobby and negotiate at the bargaining table. If you look at the chapter in the New York Code about labor, I mean, it's about a half inch thick. It's full of restrictions on what employers can do and under what circumstances they can do things. It seems your argument is shredding the whole body of New York labor law. Because they all, in one form or another, can impact on what is up for grabs in a collective bargaining process. Well, that's certainly not my intent, Your Honor. With the Court's permission, let me lay out just the five aspects of this law that I think are troubling under Bragdon, Shannon, and concerned home care providers.  The fact that it is not of general application across the city but limited to a particular subset of a particular industry. So if it were, there wouldn't be a problem if it applied to all employees in the city? I think probably not. And, in fact, that's because you wouldn't see the city writing these sort of detailed regulations for all workers as a whole. Be careful what you ask for, Kent. Well, I mean, to be clear, I actually think that the fact that you have the city regulating one narrow subset of one industry specifically looks far closer to the city writing the rules for a particular contract than it is trying to write legislation for all employees. But let me say, third, I mentioned the novelty, the fact that these laws don't have historical parallels. We haven't seen any sort of analog to them. The general just cause statutes, the Virgin Islands, Montana. This sounds like you're re-arguing Lochner. Certainly not, Your Honor. I'm simply trying to suggest that Congress There's no precedent for these wage and hour laws. There's no precedent for minimum wage laws. I should be able to. I have freedom of contract to hire 15-year-olds in my factory if I want. And we can bargain about that or whatever. But the legislature has no business telling me I can't hire 15-year-olds. So, Your Honor, to be clear, I'm not suggesting that any one of these standing alone creates a conflict with federal labor law. But I am suggesting that substantive laws can go too far. And here where you have all five of these considerations, the fourth is how stringent they were. I mentioned that these terms would be difficult for any union to bargain for. The Seventh Circuit discussed that in Shannon. And then the fifth is that they are invasive and detailed. This court in concern, Home Care, noted the detailed break requirements in Shannon. I'm not suggesting that any one of these five But what if all is full of them? What if all is chock-a-block full, page after page after page? Your Honor, I don't think we see any law that has this level of detail that so closely resembles a collective bargaining agreement. One last note on the dormant commerce clause. The Ninth Circuit's decision in International Franchise Association, we think actually analyzed this issue correctly. It asked whether the entities being regulated, their franchisees, were so interstate in character compared to non-franchisees that applying the laws to them was in effect discrimination against interstate commerce. Here, we're not regulating franchisees generally. We are regulating franchisees of chains of 30 or more.  Subjecting them to the regulations and not other restaurants is discrimination against interstate commerce. Thank you, counsel. Thank you to you both. And for your briefs and the briefs of the amici, which were very helpful. Thank you.